Argued and submitted October 8, 2003, affirmed on appeal; on cross-appeal custody of A awarded to father; remanded for entry of modified judgment January 28, 2004

## In the Matter of the Custody of Amber Dawn McBrayer and Melody Grace McBrayer, Minor Children.

### Keith Lynn McBRAYER, *Respondent - Cross-Appellant,*

*v.*

### Deborah Lynn RANDOLPH, *Appellant - Cross-Respondent.*

### 15-02-04839; A119283

83 P3d 936

Marc D. Perrin argued the cause and filed the brief for appellant - cross-respondent.

George W. Kelly argued the cause and filed the brief for respondent - cross-appellant.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

■     Mother appeals from a custody award giving her physical custody of one teenage daughter and father physical custody of the other teenage daughter. ORS 109.103; ORS 107.137. Father cross-appeals. Mother argues that it is in the best interests of both girls to be placed with her. Father also seeks custody of both children. We review *de novo*, giving proper weight to the trial court's ability to observe the witnesses, and affirm on appeal and reverse on cross-appeal, ORS 19.415(3), awarding custody of both girls to father.

    The testimony, exhibits, and record provide us with the following relevant facts. Mother and father lived together for 14 years without marrying. They had two daughters: A, born April 1988, and M, born September 1989. Mother also has an older son and a daughter, C, from a prior relationship. C and her boyfriend lived in mother's home. Father moved out of the family home in 1994. The children remained with mother for several months while father pursued custody. In November 1994, the parties reached a settlement agreement giving mother custody of both children. Shortly after the settlement agreement, mother was arrested and jailed. Father took A and M into his home, and they lived with him until May 2001. During the first seven months of their stay with father, mother did not visit the girls, but she then began weekend visitations. Mother took the girls from father's home in May 2001 without his agreement. Father visited with the girls on the weekends until the parties reached an agreement in court giving him weekday and weekend visits—although the schedule was not followed by the parties. Father initiated this custody proceeding in March 2002, and trial was held on July 30, 2002. The trial court awarded custody of M to father and A to mother.

    Mother has a history of substance abuse, particularly alcohol. She received inpatient treatment for her abuse in February 2000 because, in her words, "I went to jail. I had DUIIs [driving under the influence of intoxicants] that—about three years prior to that that I had ignored. I was still drinking. I ended up being arrested for an outstanding warrant, and once I got out of jail, that was pretty much the turning point." After completing inpatient treatment, she had a

year of outpatient treatment. At the time of trial, she had been out of treatment for about a year.

In 1994, both alcohol and drugs were abused in the home with mother's consent—including drinking by minors. In addition, mother permitted C, then 14 years old, to engage in sexual relations with her older teenage boyfriend while in the family home. C gave birth to her first child at age 15 and to her second child at age 17. The boyfriend sold drugs out of mother's home and was once convicted for shooting a bullet into father's car, barely missing A. While father admits to past drug use, there is no indication in the record that he had an ongoing problem with substance abuse. Father left the family home because of the continuing conflict with mother over parenting approaches and the conditions there. In 2002, he became concerned again about mother's parenting when he perceived that the girls were frequently left to fend for themselves and did not know their mother's whereabouts. He testified that his perception prompted the initiation of this proceeding.

Also relevant to our consideration is the fact that mother works for her brother supervising up to eight high-risk foster boys in his home. The boys, ranging in age from 5 to 18 years, are sex offenders under the authority of both the Department of Human Services and the Oregon Youth Authority. Mother's brother testified that, although it was inappropriate for A and M to be around the boys, "[t]hey've been at the home or out at the lake with [mother], when she is on duty, if needed." Father testified that the girls had not kept their scheduled visits with him many times, telling him they "had to help babysit" the foster boys.

Both parents expressed love towards the girls and pride in their accomplishments. They also both had concerns about A's anger problem. Three years before trial, father had the family attend five counseling visits to address his concerns. He has also taken several parenting classes over the last five years. Mother testified that A was currently receiving counseling for anger management problems and that she had seen some improvement in A's ability to find appropriate outlets for her anger. Father admits to having arguments with A and that on one occasion he locked her out of the house

in the middle of the night. Mother testified that father told her that he could not handle the girls and that he asked her for help. Around that time that mother took the girls to her home. However, mother and M have not been spared from A's anger either. Mother testified that the girls bicker all the time but that they are no more a danger to each other than other teenagers fighting with each other.

Under ORS 109.103, a proceeding to determine the custody of children of unwed parents incorporates by reference the factors set out in ORS 107.137. That statute provides that a court "shall give primary consideration to the best interests and welfare of the child," taking into consideration several specific factors while not isolating any particular one to the exclusion of other relevant factors. Under ORS 107.137(1), those specific factors include: "(a) [t]he emotional ties between the child and other family members; (b) [t]he interest of the parties in and attitude toward the child; (c) [t]he desirability of continuing an existing relationship;" preference for a fit primary caregiver of the child; and "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." ORS 107.137(3) provides that "the court shall consider the conduct, marital status, income, social environment or life style of either party only if it is shown that any of these factors are causing or may cause emotional or physical damage to the child."

The trial court found that both parents are fit and proper persons to be awarded sole custody of the children. We agree with the trial court regarding father. Father appears to be not only a fit parent, but he has also been the primary caretaker of his daughters for most of the last decade. He has consistently made the needs of his daughters a priority in his life as demonstrated by his financial support and time commitment to their activities and upbringing. His struggles with A do not appear, with some exceptions, to be out of the ordinary. On the other hand, we have concerns about mother's exercise of parental judgment as it relates to child rearing, both in the past and in the present, including her acquiescence in her then 14-year-old daughter's sexual relationship and taking A and M to the place where she works.

Mother also assisted M in the unwise premature removal of her orthodontic braces.

A and M have strong emotional ties to both parents, to each other, and to their older half-siblings.[1] They have a relationship with their maternal grandparents, who live next door to mother. The girls have friends in both communities and schools where their parents live. (The parents live about a half-hour traveling distance apart.) Father testified that, despite the girls' emotional attachment to their older half-siblings, he had concerns about the influence of those individuals on A and M in light of the half-siblings' lifestyles.

■     We do not take our *de novo* review function lightly in this case. The trial court had the opportunity to view the witnesses first hand, and we respect its thoughtful consideration of the issues. However, the law requires us to make our own judgment on the record made in the trial court, and we do so in light of the statutes promulgated by the legislature. Underlying the statutory requirements is a strong preference for keeping siblings together. *See Amundson v. Amundson,* 7 Or App 33, 35, 489 P2d 983 (1971). In this case, the trial court separated A and M out of concern that A, whom the court perceived to be at risk, would run away from father if he was awarded her custody, thereby placing herself at risk for harm. It appears that the trial court would have placed both children with father but for that concern. We therefore think that it is helpful to a resolution of this case to consider the policy behind keeping siblings together and the circumstances when courts should exercise their authority to separate siblings.

In *Henry v. Henry,* 156 Or 679, 683-84, 69 P2d 280 (1937), the Supreme Court upheld a custody decision that placed the son with the father and the daughter with the mother. In doing so, it explained: "The controlling and paramount question for consideration in a case such as this is the welfare of the minor children." *Id.* In *McFadden v. McFadden,* 206 Or 253, 292 P2d 795 (1956), the Supreme

---

[1] Although the pleadings show that father requested that the girls testify, they did not testify, and the only indication that we have of their preference is mother's testimony that they had expressed to her a desire to live with her.

Court was again faced with a case of divided custody of siblings. It quoted from one of its earlier cases, *Schiermeister v. Schiermeister*, 199 Or 391, 395, 261 P2d 677 (1953): "As in all cases involving the custody of minor children, the primary and controlling consideration is their best interests and welfare; *every other consideration is secondary*." *McFadden*, 206 Or at 258 (italics in *McFadden*, internal quotation marks omitted). The court also discussed the separation of siblings:

> " 'Divided families', that is in the sense of a separation of young children of a given family, should also be avoided when the children can be united in one home under one parent without sacrificing the welfare of the children to the accomplishment of such unity. *Nelson on Divorce [and Annulment]*, supra § 15.18 p. 194 [2d ed 1945]."

*Id.* at 260-61.

 *Nelson on Divorce and Annulment* summarizes many of the cases contained in the 1964 American Law Reports annotation that we cited in *Amundson*. That annotation provides this summary:

> "In general the cases in this annotation support the proposition that where there are no exceptional circumstances, the children of divorced parents, especially those children of tender years, should not be separated by awarding custody of one child to the mother and custody of another child to the father. However, *if the welfare of the children will be advanced by such a disposition,* there appears to be no question of the court's power to enter such a decree. No single consideration appears to be of controlling weight in determining whether the court should make an award which results in the separation of the children. However, in passing upon the propriety of a decree providing for separation of the children, the courts have relied to some degree upon such factors as the ages of the children; the wishes of the children themselves; the health of the parent; the relative economic status of the litigants; the mother's employment; the court's desire to avoid conflicts over visitation privileges; and the fact that one of the children might be a harmful influence upon the other."

Annotation, *Propriety of Separating Children by Awarding Custody to Different Parents*, 98 ALR 2d 926, 928 (1964) (emphasis added). We understand from the above-cited

authorities that the policy of keeping siblings together presumes that it is in a child's best interest and welfare to grow up with the other child or children in the family.[2] However, consistently with ORS 107.137, that presumption can be overcome where there are "overriding reasons" demonstrating that the welfare of a child is better served by separation from a sibling. *Moe and Moe*, 66 Or App 947, 951, 676 P2d 336 (1984).

More recent opinions from this court and from other courts nationwide provide additional guidance as to what will constitute overriding factors or exceptional circumstances that justify separating siblings. In two cases where we ordered that siblings be separated, we considered the nature of the relationship between the children and the children's individual preferences. *See Harper and Harper*, 81 Or App 656, 657-58, 726 P2d 972 (1986); *Sawyer and Sawyer*, 29 Or App 553, 556, 564 P2d 739 (1977). In two cases in which we reversed a trial court's order splitting the children, we again relied on the nature of the sibling relationship, *Sagner and Sagner*, 49 Or App 215, 218-19, 619 P2d 660 (1980), and the child's preference, *Moe*, 66 Or App at 950-51 (child testified and prepared a list of reasons why she preferred one parent that included safety concerns). In another case, we affirmed the trial court's award of three children—14 years, 7 years, and 3 years—to one parent even though the custody evaluator recommended splitting custody. *Spurgeon and Spurgeon*, 119 Or App 59, 63, 849 P2d 1132 (1993). In that case, the trial court relied on the children's close relationship, the instability in their living situation over several years, and its concerns about parental relationships with one of the children. *Id.* at 62-63.

---

[2] An updated annotation provides further explanation for the policy of keeping siblings together:

> "The courts have generally reasoned that the divorce, dissolution or separation has destroyed a portion of the family unit, and that to separate the children would further destroy any shreds of familial ties. Moreover, when parents are fighting with each other, the children often turn to each other for comfort and mutual support and become exceptionally close. And a decree separating the children is subject to the criticism that it is merely a compromise of the respective claims and feelings of the parents."

Jay M. Zitter, Annotation, *Child Custody: Separating Children by Custody Awards to Different Parents—Post-1975 Cases*, 67 ALR 4th 354, 360 (1989).

Finally, a review of cases from other states and the most recent annotation on the subject demonstrates that other courts have found particular factors relevant: the interrelationship of the children (including fighting and rivalry); the undesirable habits and influence of an older child; an older child reaching the age of emancipation; prior separations or nonacquaintances of siblings; the stability and capabilities of parents including a parent's involvement in the child's upbringing; an inability of a parent to care for children; the fact of a child previously residing with the custodial parent; a change in a child's behavior; a child experiencing emotional and educational problems while with one parent; and parental instability. Other factors include a child's express preference, the traumatic impact of a breakdown of the relationship between a parent and child, and the endangerment of a child's emotional health. Jay M. Zitter, Annotation, *Child Custody: Separating Children by Custody Awards to Different Parents—Post-1975 Cases*, 67 ALR 4th 354, 360 (1989).

In light of the above considerations, we turn again to the facts of this case. Here, A and M have always lived together. Mother testified that, although they engage in normal sibling bickering, she did not think it would be helpful to separate them. Some independent indication that their relationship is close and supportive also exists in the record. For instance, they have participated in sports together, and, when A was locked out of father's home, M made sure that A was able to arrange to be picked up by their mother. Significantly, father *also* asserts that the girls should remain together. Although the trial court arranged visitation so that the girls would have weekends together, we have observed that "[f]requent visitation is not much of a substitute for the spontaneous interplay between the children which occurs if the children live in the same house." *Sagner*, 49 Or App at 219.

The trial court found that A would run away if placed with father. We are unsure of the evidence that prompted that inference.[3] The record demonstrates that A

---

[3] Mother testified to the following in response to a question from her counsel about what concerns she had about separating the girls:

has "run away" to some extent from both parents. Although father appears to be the more protective and strict parent, nothing in the record persuades us that mother would have any fewer problems with A's conduct, particularly if she imposed reasonable restrictions on A's activities. As the trial court observed, A is "out of control to some degree. Both parents are going to have to work very hard to solve that problem." In sum, our review of the evidence does not convince us that it is in the best interests of A to separate her from her sister as a means of encouraging her not to run away.

To the contrary, the policy of keeping siblings together, along with our concerns about mother's judgment in child rearing and father's past role as the primary caregiver, convince us that it is in A's and M's best interests and welfare that they be placed with father. It may be that the trial court is a better predictor of the future than we are. Nevertheless, we have performed a *de novo* review of the record, a review that demonstrates to us that it is in the best interests of both children that they not be separated, and, for the reasons expressed above, we find that it is in their best interest that father be awarded their custody.

Affirmed on appeal; on cross-appeal custody of A awarded to father; remanded for entry of modified judgment.

---

"Well, I believe that siblings should live together. I don't—I feel very strongly that they should live together. Both girls want to live with me. They've expressed that to me. They do love their father and want to see him, but I do believe that [A] would have so many problems with her father that she wouldn't stay, and I believe that [M] would feel very abandoned and hurt. She wants to live with me."