Argued and submitted June 20, 2006, reversed and remanded May 23, 2007

In the Matter of the Marriage of

Roberto MORALES,
*Appellant,*
*and*

Ludivina MORALES,
*Respondent.*

C 04-1902 DRB; A127614

159 P3d 1183

Monica L. Finch argued the cause for appellant. With her on the briefs were Eli D. Stutsman and Eli D. Stutsman A Professional Corporation.

Marc Geller argued the cause for respondent. With him on the brief was Marc Geller, P.C.

Before Landau, Presiding Judge, and Schuman* and Ortega, Judges.

ORTEGA, J.

---

* Schuman, J., *vice* Ceniceros, S. J.

**ORTEGA, J.**

This appeal from a general judgment of marital dissolution involves only the question of who should have custody of E, the youngest of the parties' two sons. The parties agreed that mother would have custody of the parties' older son, J, but father now challenges the trial court's decision that mother should also have custody of E. We review *de novo*, ORS 19.415(3), and, having given due consideration to the trial court's ability to assess the parties' credibility and demeanor, *Cooksey and Cooksey*, 203 Or App 157, 172, 125 P3d 57 (2005), we nevertheless reverse.

We begin with a brief overview of the record before turning to a more detailed examination. Father and mother were married in August 1986. J was born in 1988, and E was born in 1994. The family initially lived near Hood River, where mother's family lives, but moved to the Beaverton area around 1998. Father had first moved to the United States as a young adult, and his family lives in Mexico. Mother was born in Mexico but has lived in the United States most of her life.

Mother alleged, and father denied, that he was abusive to mother and the children during the marriage. The parties separated in March 2004, after father and J had an altercation during which father hit J. Trial was held in November 2004. For most of the time between the separation and the trial, mother and J lived in Hood River with mother's brother's family, and father and E lived in the family home in Beaverton. E has special health and education needs and was making good progress in addressing those needs during that period.

Before trial, the parties agreed that mother would have custody of J and stipulated to the resolution of all issues except for the custody of E. The parties further stipulated to a custody evaluation by Billie Bell, who ultimately recommended that father have custody of E. Despite that recommendation and E's expressed preference to live with father, the trial court decided that mother should have custody of E, apparently based on the undisputed incident in which father struck J and on a desire not to separate E and J. Although the

parties offered conflicting testimony, the trial court made no credibility findings. The trial court also made no findings regarding E's particular health and education needs, factors that are extremely significant to E's best interests and welfare, or regarding E's express desire to remain in father's custody. Giving "primary consideration to the best interests and welfare of the child," ORS 107.137(1), we reverse and remand.

Turning to a more detailed examination of the record, we begin with mother's allegations that father abused her. Mother testified, and father denied, that he was verbally, physically, and sexually abusive to her. Mother described a handful of such incidents, but acknowledged that she had never called the police. Both boys frequently heard their parents arguing in Spanish, which they do not understand, but denied seeing any physical abuse, according to Bell, although J reportedly believed mother's accounts that father verbally abused her. Although Bell, who has experience and training in dealing with domestic violence, acknowledged a possibility that more abuse had occurred than mother had reported, her assessment was that mother had not been hiding abuse and did not appear to be frightened of father. It is undisputed that father hit J on one occasion, and it appears that father and mother had loud verbal disagreements. However, having reviewed the entire record *de novo*, we do not find mother's other allegations of abuse to be credible. To elaborate further on the details of the record and our analysis would not benefit the parties or serve any public interest. *Jackson and Jackson*, 147 Or App 500, 505, 936 P2d 1043 (1997).

Mother also testified that father drank excessively, and her brother Julio echoed that concern. Father acknowledged drinking 10 beers per week before the parties' separation, but testified that he had dramatically reduced his drinking after the separation and that he had stopped drinking in the three months before trial and was attending programs supporting abstinence from alcohol. Bell received reports from several of father's neighbors, coworkers, and friends, none of whom expressed concerns about his drinking. Although she had not been asked to perform an alcohol

assessment, Bell indicated that she did not see signs that father is an alcoholic and that she believed he was on his way to resolving any problem with alcohol.

In addition to receiving written reports from neighbors, coworkers, and friends of both parents, Bell conducted interviews of both parents and both boys. The boys reported hearing loud arguments between the parties in Spanish, and both reported that both parents looked angry, that neither looked angrier than the other, and that each occasionally backed down. Bell suspected that both parties had anger management problems: "By both kids' report they would scream at each other in Spanish." Consistently with that account, father acknowledged that he and mother yelled at each other during arguments but denied any verbal abuse.

J reported to Bell that mother had told him that father was verbally abusive. Mother denied talking to J about verbal abuse, claiming instead that J would ask her questions and that she would say only that she and father had had an argument. Mother acknowledged that her account was inconsistent with J's account as described in Bell's report and could not explain that inconsistency.

Bell opined that J is very close to and "bordering on * * * enmeshed" with mother. J told Bell that he was angry with father and felt that he needed to protect mother, although J also reported that father did not physically abuse mother. He indicated a number of grievances against father, including a desire that father should not "talk back" to mother when they argue and that he didn't want father to "challenge" him. In Bell's view, J "knows too much about what's going on for a 16-year-old boy. He knows what dad is saying[;] he knows what mom wants. He talks to his brother about it. He's here today outside [the courtroom]."

Mother also testified—and father denied—that father hit the boys regularly (though some of her testimony actually contradicts that allegation). Neither mother's brother Julio nor his wife, Nancy, ever saw father hit the boys, although Julio opined that father spoke harshly to the boys to discipline them. In her custody evaluation report, Bell noted that the children denied mother's allegations that they

were abused. Mother acknowledged that portion of the report, but could not explain why both children would falsely deny the abuse that she alleged.

It is undisputed that, in March 2004, eight months before trial, father struck J. Father had drunk two or three beers that evening. According to father's testimony and J's report to Bell, mother told the children that the parties were going to divorce because of father's conduct, and father objected to her statements (according to father, to keep the children out of it; according to mother, to defend himself). E left the room, and J interjected that father was the one who needed to change (not mother); when father objected to J talking to him like that, J asserted, "I just did." A scuffle ensued, with father and J pushing and shoving each other and, whether inadvertently (according to father) or intentionally (according to mother), bumped heads. Father acknowledges that he pushed J first and that he hit J in the stomach; J later told the police (whom mother called) that he had hit father in the stomach as well.

Mother testified—and Julio and his wife Nancy offered corroborating testimony—that father told her the next day, "I'm sorry I hit [J], but I already warned you if you didn't control your son, that's always going to happen." For his part, father testified that he apologized to J the next day and expressed remorse. Father acknowledged that he had not done the right thing in the altercation with J; he felt bad about what had happened and the resulting damage to his relationship with J.

As a result of the incident, father was cited, and he later pleaded guilty to harassment and was placed on probation.[1] Father participated in various services and contacted a counselor available through a workplace program. As part of his probation, he took parenting classes, attended a program addressing alcohol abuse and another addressing anger management. Father's probation officer told Bell that father was

---

[1] There was another incident in which father inappropriately handled his anger, but it did not involve the children. In the fall of 2003, about six months before the parties separated, father had an altercation with another man while they were in line at a store. The two men yelled profanities and kicked and hit each other. Father admitted that had made a mistake in that incident.

following probation recommendations, and the officer had no concerns about father. Father asked Bell for additional referrals if she thought that he needed further anger management work, which she apparently did not.

Bell testified that she did not currently have concerns about father's ability to manage his anger. Although she believed that the incident with J had been cause for concern at the time, father was successfully addressing his anger issues. Bell noted that J did not "feel bad about [the incident], but [father] does. That's always a good sign to me."

Bell also thought that father and J "both had a hand" in the altercation. J reported two other times when he "went after" father. Bell was concerned about the triangulation between mother, J, and father and "about the side[-]taking that's been going on with these boys. By [J's] own admission, there had been other times when he has physically attempted or successfully confronted his dad in a physical manner."

Bell also noted that there had been no similar incidents involving E. Bell testified that E identified no fear of father, despite the fact that "both boys are very verbal boys." As she explained, "They're not afraid to say what they think or what they mean. So I had no concern that he was not telling me the truth." E's teachers and health care providers testified that they saw no signs of violence or inappropriate behavior by father.

During the period between separation and trial, E and father lived in the family home in Beaverton, and E was able to continue attending the same school that he had attended since kindergarten. Shortly after the parties' separation, mother and J moved in with Julio and his family. Other members of mother's family live nearby. Mother had applied for apartments—even briefly moving to one that subsequently proved to have inadequate heating—but she had not yet found a suitable one. Julio and Nancy were looking into the possibility of adding on to their home to create a separate living area for mother and the two children. At the time of trial, mother and J shared a room; when E was there, he sometimes stayed with Julio's sons in their room and sometimes shared mother and J's room.

Although E has ties to mother's family, he told Bell that, if he moved to Hood River, he would miss his friends in Beaverton more than he missed his cousins while in Beaverton. E apparently missed mother while he was with father and missed father while he was with mother. E told Bell, however, that he wanted to continue living with father.

Bell noted that mother's family was "pretty verbal to [E] about [father] being verbally abusive and he needs to live with his mom." Father testified—and mother offered no controverting evidence—that he has had a strained relationship with mother's mother ever since he spoke to mother's family about his concern about the continuing effects on mother of certain childhood incidents. Father attributed the beginning of problems in the marital relationship to that dispute.

We turn to an examination of the parties' respective treatment of health and education issues. Both children were extremely obese at the time of trial. Mother testified that, before the separation, she did most of the cooking and prepared healthy meals, but the children would overeat. However, she also testified that—due to depression for which she has been prescribed medication but for which she has never seen a counselor—she was often tired. As a result, she would give E a snack and let him watch television after school while she napped and, several times per week, asked father to pick up fast food on his way home from work. Father offered to remedy the situation by cooking dinner when he got home from work, but mother generally declined because then dinner would be late in the evening.

As noted, E has significant health needs related to his weight. An unhealthy diet and a lack of exercise create a high risk for diabetes and a long-term risk of heart disease; indeed, father and some of mother's relatives suffer from diabetes. For the sake of his health, E needs to exercise, lose weight, and watch what he eats. After mother took E to his regular physician to address his complaint of stomach aches, E was referred to Dale Willis, a pediatric endocrinologist. Willis saw E in May 2004, shortly after the parties separated. Both parties attended that appointment, but mother made no further contact with Willis.

Six months before trial (and shortly after the parties separated), E had a body mass index (BMI) of 40; a normal

BMI for a child his age would be 18 or lower. He was just over five feet tall and weighed about 215 pounds. By the time father brought E to Willis again four months later, in September 2004, E had lost about 6.5 pounds, which Willis considered good progress.

Suzanne Brewster, a registered dietician and diabetes educator, saw E in classes with father. Father attended regularly, brought in recipes and records of the work that he and E were doing, kept detailed track of E's diet and physical activity, and sought information on additional programs. Brewster saw a slight improvement in E's health; E had some overall weight loss and was establishing new habits to support weight loss.

By the time of trial, E weighed about 200 pounds. Following Brewster's advice, father gave E choices about what to eat so that E could find healthful foods that he liked. When father and E went to a fast food restaurant, father checked nutrition information to find a nutritious, low-calorie item. Father and E exercised (indeed, father also reported a 20-pound weight loss since the parties' separation), and father adapted to E's needs by finding new exercise equipment and shoes for E when E developed problems with his feet. Father also found E a physical therapist. E reported to Bell that he enjoyed the time that he and father spent exercising together.

E apparently followed a less healthful diet and got less exercise when he was with mother. Although mother's sister-in-law Nancy created a fairly strict, portion-controlled diet for the household, mother apparently was less attentive to diet matters when she fed the children. Mother looked into a diabetes program and membership in a gym, but both mother and Nancy found that E was resistant to exercise. Both children told Bell that they did not exercise at mother's home and that they ate more hamburgers and fries there. Mother acknowledged that Bell "asked me about deficiencies that I thought I had. And I now believe I should have told her that, yes, I do need to work more on making sure my boys exercise. That is something that I think I lack."

In addition to his health needs, E has special needs with regard to his schooling. E has problems with his reading and, according to mother, with math. Mother did not work

outside the home until E was in the first grade, when she became a teacher's assistant, and she helped in E's preschool, receiving awards for her involvement by her report. Mother felt that, because of her experience, she could help E, but that father was impatient and not good at helping E. Mother testified that, before the parties separated, she had frequent contact with E's teachers.

During the school year that ended with the parties' pretrial separation, however, E missed 45 days of school, which was a concern for E's teachers. Mother attributed those attendance problems to E's health, claiming that E sometimes would throw up in the morning after overeating. Mother claimed that she told E that he needed to go to school anyway, but did not explain how, in that case, E missed so much school. She did acknowledge, however, that E missed one week of school because, after the parties separated, she took him to Hood River without making arrangements with E's teachers and without telling father what she was doing.

At the time of trial, E was in the fifth grade. He had missed three and one-half days of school during the current school year. E's teachers testified that father contacted E's school teacher at least weekly and his after-school teacher daily. Mother had spoken with the fifth-grade teacher only once, explaining that she felt she might not have a right to do so. Both teachers felt that father was very interested in E's education and in helping E with his schoolwork. In Bell's view, father made more contact with E's teachers after the separation than either party had done in the past.

The teachers testified that E was doing well in school and in his after-school program and is a happy child who gets along well with other children. E had friends at school and in his neighborhood and played with them most days. Although E's teacher testified that he was doing well in math, mother claimed that he still had problems with math and did not understand math problems that she tried to explain to him. However, Bell testified that E "identifies that for the first time he's felt kind of happy and successful. His word, not mine, the term 'successful.' "

Bell thought that, to address his learning issues, E needed to be in school and needed the greater structure that

he had in father's home. Although J had enrolled in an on-line school,[2] mother agreed that E should attend public school but wanted to enroll him in Hood River.

The parties offered conflicting testimony about their respective abilities to encourage E's relationships with others and disputed father's level of cooperation in scheduling extra parenting time for mother. Father acknowledged refusing mother's request to have E with her for the majority of the summer break, attributing his unwillingness to concerns that mother might impede E's progress on weight loss. Each party acknowledged that the children need both parents, and each denied making negative comments about the other to E. E told Bell that father did not talk about mother and talked about J only to say that he missed him, but reported that mother told E that he should not live with father, and that J told him that he hated father and that father was abusive to mother. E was unhappy and confused about the strife between father and J. Mother had heard J make negative comments about father to E, but claimed that J stopped after she told him not to. She testified that she told J that he could talk with her about father but not to make negative comments about father to E.

In mother's view, E and J "fight a lot, like most kids, but they do get along really well." Mother explained that the boys fought over taking turns with video games or about E wanting J to help him with a game when J was doing something else, but that the boys would help each other with video games and talk about movies.

Bell thought that father had an easier time identifying positive traits in mother than mother did identifying positive traits in father. She was concerned that E's relationship with father would deteriorate if he were in mother's custody because of mother's and J's negative comments about father. Bell noted that "you can't live in a household with that going on and not join in that or you're going to be an outsider * * *." As to parenting E, Bell was "more concerned about

---

[2] According to mother, J had missed a lot of school because of illness, and the on-line program was good for him because he could work at his own pace. Mother gave somewhat inconsistent accounts of how J was doing with that program, and he apparently was somewhat isolated from people outside mother's family.

[mother's] enmeshment [with J] and [her] inability to not bad-mouth [father] at this time than * * * about [father's] issues, because [father] is doing well, according to probation and according to his son." Bell thought that conditions at father's home were better and less stressful for E.

Bell recommended that E's temporary placement with father continue permanently, despite the resulting separation of the two siblings. She explained:

> "Both [mother] and [J] are very verbal with [E] about the fact that he shouldn't live with his dad. [J] is very verbal with [E] about the fact that he believes that his dad is violent because his mom has said that his dad is violent. So the separation piece is already there for these boys. Also the age of these boys puts them in a very different * * * cohort. * * * [T]hese boys are six years apart. They identify being somewhat close to each other, but not real close."

Bell believed that father was E's primary caregiver at the time of trial, though she acknowledged that mother could become the primary caregiver. Both children reported that E was closer to father and J was closer to mother, and each child expressed a wish to remain with the parent to whom he was closer. E did better in school and made many positive changes while in father's custody. In Bell's view, "[t]hey both have very good reasons and very good explanations for why they want to remain with the parent that they're with."

■■ Under ORS 107.137(1), the child's best interests are to be given primary consideration in determining custody. In making that determination, the court must consider the following factors:

> "(a) The emotional ties between the child and other family members;
>
> "(b) The interest of the parties in and attitude toward the child;
>
> "(c) The desirability of continuing an existing relationship;
>
> "(d) The abuse of one parent by the other;
>
> "(e) The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court;

"(f)   The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. However, the court may not consider such willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in a pattern of behavior of abuse against the parent or a child and that a continuing relationship with the other parent will endanger the health or safety of either parent or the child."

ORS 107.137(1). None of those factors may be relied on to the exclusion of the other factors, but, "if a parent has committed abuse, as defined in ORS 107.705, there is a rebuttable presumption that it is not in the best interests and welfare of the child to award sole or joint custody of the child to the parent who committed the abuse." ORS 107.137(2).

■ ■   Generally, children's best interests are served by keeping siblings together, but that presumption is overcome when overriding reasons demonstrate that the child's welfare is better served by separation from a sibling. *McBrayer v. Randolph*, 191 Or App 553, 559-62, 83 P3d 936 (2004) (reversing and placing teenaged sisters together where such a showing was not made). Separating siblings may be justified for reasons including the relationship between the siblings, the children's respective custodial preferences, the children's prior separations and custodial placements, or one child's emotional and educational problems while with one parent. 191 Or App at 560-61.

Here, the trial court found that it was in E's best interests for mother to have custody, apparently relying primarily on the incident in March 2004 when father hit J and on the presumption that E and J should be together. On appeal, father contends that the trial court erred, because E's best interests require custody with father. He contends that the ORS 107.137(1) factors weigh in his favor and that, through his participation in services, he has rebutted any negative presumption arising from the March 2004 altercation with J. For her part, mother relies on a very different interpretation of the record and contends that the statutory factors favor her.

We examine each of the factors in turn, giving appropriate weight to each, and beginning with the emotional ties between E and other family members. The trial court's only findings regarding that factor were that E was closer to father than to mother and that the court saw no good reason to separate E and J. The court made no findings regarding the strength of the ties between E and J or between E and members of mother's family. Father emphasizes his closer relationship with E and contends that the relationship between E and J is not particularly close. Mother emphasizes her role in E's life before the separation, blames father for her lack of involvement in E's education and health after the separation (an assertion that is not supported by the record), and contends that E and J are close and that E has close ties to her family in Hood River.

We conclude that the "emotional ties" factor does not strongly favor either party. Nevertheless, despite our reluctance to separate siblings, we find that such a separation is justified in this case. Bell concluded that the two brothers are somewhat close but not really close, in part because of their age difference. Although mother asserted that the brothers were close, her only examples of their relationship pertained to a shared interest in video games and movies. In light of the strain between father and J, Bell opined that conditions are less stressful for E when E and J do not live together. In addition, each child expressed a preference for being with a different parent. Whatever bond may exist between J and E, under the particular circumstances of this case, they do not benefit from living together.

As to E's relationship with mother's extended family, we find that emotional ties exist but that such ties will not be undermined if E lives with father. Given that mother resides near her family and maintains close ties to them, E likely will see mother's family more during mother's parenting time than he did before the parties' separation. In any event, given the evidence that mother's family has made negative comments to E about father, overemphasizing E's relationship with mother's family could undermine E's stronger relationship with father.

We turn to the second factor, the parties' interest in and attitude toward E. The trial court found that both parties were interested in E, but noted that father had physically abused J. Under this factor, we consider the parties' interest in and attitude toward E, whose custody is at issue. We address the issue of father's abuse of J below, in the context of our discussion of ORS 107.137(2).

We agree that both parties have demonstrated their interest in E. However, father has demonstrated a stronger interest in E's education and health needs and has been far more effective than mother in addressing those needs. Although we do not question that mother cares about E's needs, she has not followed through effectively to meet them.[3] Father, by contrast, has actively sought information from E's teachers and health care providers and has carefully followed the advice received. E did better in school while father had custody, which is particularly important given his learning disabilities.[4] Moreover, father apparently has involved E in decision-making so that E experiences the changes in his diet and exercise routine as his own successes. E reports enjoying exercise with father, but mother and Nancy both testified that E was resistant to exercise at mother's home. We view this factor as deserving of special consideration because of the significant risk to E's health if he does not continue to build on the success he has experienced so far. We conclude that this factor strongly favors father.

Regarding the third factor, "[t]he desirability of continuing an existing relationship," the trial court found that "it is not desirable to have the children separated." As noted, we do not view that factor to be as influential as did the trial court. We view as more significant, regarding this factor, the trial court's finding that E was closer to father than to

---

[3] Indeed, both boys' weight gain necessarily occurred during a time when mother, by her own admission, was in charge of the family's diet. Her testimony that she prepared primarily healthy meals but the boys ate too much strains credibility and calls into question her testimony regarding the diet the boys now consume in her separate household.

[4] We note that E missed the equivalent of nine weeks of school during the year that ended with the parties' separation, when mother was his primary caregiver, and that, shortly after the separation, she took him out of school for one week without obtaining his assignments. We note also Bell's assessment that father had much more frequent contact with E's school than mother had previously.

mother. E was in father's custody from the time of the parties' separation through the time of trial, and father apparently was E's primary caregiver during that time. E reported to Bell that he felt happy and successful while in father's custody, despite the stresses arising from conflict among the family members. Significantly, E wished to continue that custodial relationship. Under the circumstances, this factor weighs heavily in favor of granting custody to father. *See Tuttle and Tuttle,* 62 Or App 281, 286-87, 660 P2d 196 (1983) (according significant weight to the children's sense of security in their mother's custody since separation and to a 10-year-old's expressed desire to remain with the mother).

As to the fourth factor, "abuse of one parent by the other," the trial court noted father's abuse of J and mentioned that mother "alleged long term abuse of her" and that "[t]wo witnesses testified that [f]ather stated he would hit [J]." We do not understand the trial court's findings to include an implicit credibility finding in favor of mother on this issue; rather, the trial court referred only to what mother "alleged" and based its custody ruling on other specific findings. Because we do not find mother's accusations that father abused her to be credible, we find that this factor is not pertinent to the determination of custody here. Further, the incident in which father hit J does not involve abuse of a parent, so we address it below in our analysis of ORS 107.137(2).

Regarding the fifth factor, "[t]he preference for the primary caregiver of the child, if the caregiver is deemed fit by the court," the trial court found that "prior to temporary orders it appears to the [c]ourt that [m]other was the primary caregiver and is a fit person to have custody." We accept the finding that mother was the primary caregiver before the parties' separation and that she is fit, but we find that factor to be entitled to less weight under the circumstances of this case. Father was the primary caregiver from the time that the parties separated through trial; that is implicit in the trial court's finding of mother's role "prior to temporary orders" and is well-supported in the record. Although this factor favors mother, it does not outweigh the other factors favoring father.

We next consider the sixth factor, each parent's willingness and ability to facilitate and encourage E's relationship with the other parent, unless "one parent shows that the other parent has sexually assaulted or engaged in a pattern of behavior of abuse against the parent or a child and that a continuing relationship with the other parent will endanger the health or safety of either parent or the child." Addressing this factor, the trial court indicated that it was "very concerned about [f]ather's control issues, and about [m]other's statements to the children, involving them in these matters." Because the trial court considered each party's willingness and ability to foster relations with the other parent, we infer that the trial court found that mother failed to show sexual assault or a pattern of abuse on father's part. We explicitly make the same finding.

Although the trial court identified legitimate concerns regarding each party, we conclude that this factor ultimately favors father. He has given mother some extra parenting time, despite his refusal to give her all of the extra time that she requested during E's summer vacation. More significantly, according to E's reports to Bell, father avoids speaking badly of mother, but mother makes negative comments to E about father and, as the trial court found, has involved the children in her disagreements with father. Additionally, mother took E for a week-long unauthorized visit to Hood River, causing him to miss school, without making arrangements with father. We do not find credible her testimony that she did so out of concern for E's safety. On the whole, we find that father is more likely to encourage E's relationship with mother than vice versa.

We turn to the final step in our analysis, involving the rebuttable presumption that it is not in child's best interest to be in the custody of a parent who has committed abuse. ORS 107.137(2). The trial court made no findings directed specifically toward this factor, although it did find that father had abused J. We agree that father's conduct in the March 2004 incident constituted abuse. We find, however, that father feels remorse over his conduct and has engaged in services intended to ensure that no such incidents occur again. Furthermore, mother's contributions to the incident with J—which appear to be part of a pattern of involving J in

her disagreements with father—cause us a level of concern about her sensitivity to J's best interests that makes it inappropriate to give mother the benefit of a presumption that she, rather than father, should have custody. Given father's satisfactory participation in services and given that father's interactions with E have been consistently positive, we conclude that father has rebutted any presumption against awarding custody to him.

Giving appropriate weight to the factors identified in ORS 107.137(1), we conclude that E's interests and welfare are best served by awarding custody to father.

Reversed and remanded.