Argued and submitted April 9, reversed and remanded with instructions to reinstate award of custody to mother and for reconsideration of child support and parenting plan provisions September 1, 2010

In the Matter of the Marriage of

Kathleen M. BRADBURRY,
nka Kathleen Sutton,
*Petitioner-Appellant,*

*and*

Virgil F. BRADBURRY, II,
*Respondent-Respondent.*

Marion County Circuit Court
98C32891; A140581

238 P3d 431

George W. Kelly argued the cause and filed the briefs for appellant.

Rachel J. Kittle argued the cause for respondent. With her on the brief was Law Office of Gordon L. Dick.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

DUNCAN, J.

## DUNCAN, J.

This is a child custody case in which mother appeals the trial court's supplemental judgment changing custody of the parties' youngest child, C, from mother to father. Mother argues that father failed to prove a substantial change in circumstances since the initial judgment establishing custody. She further argues that, even if there was a substantial change in circumstances, father failed to establish that it was in C's best interests to change custody of C from mother to father. We reverse and remand.

■ We review the trial court's custody decision *de novo.* ORS 19.415 (2007).[1] The inquiry in child custody cases is fact intensive. With that in mind, we begin with a detailed history of the parties' relationship with each other and with their children. We then analyze those facts according to the factors set forth in ORS 107.137(1).

## FACTS

Mother and father married in 1991. They have two daughters, L and S, and a son, C. L was born in 1993, S in 1996, and C in 1997. This case concerns the custody of C only.

Mother and father separated in 1998, when C was about 14 months old. Mother and the children moved in with mother's father, Green. Mother and father divorced in 1999, and, in a stipulated judgment, mother was awarded sole custody of the children and father was awarded parenting time.

Although the parties stipulated to the custody and parenting time awards, a serious dispute regarding parenting time arose. Shortly after the divorce, father kicked in mother's door because he was angry about not being able to see the children. The children did not witness the event; according to father, the oldest child, L, was in bed at the time. Based on father's actions, mother obtained a restraining order against him.

---

[1] ORS 19.415 was recently amended. Or Laws 2009, ch 231, § 2. The amendments apply to appeals in which the notice of appeal was filed on or after June 4, 2009. Or Laws 2009, ch 231, § 3. Because the notice of appeal in this case was filed before that date, we apply the 2007 version of ORS 19.415.

Early on, when father would come to visit the children, he would often take only L out. S and C were still in diapers, which, according to mother, was too much of a hassle for father. Father's visits with C increased when C was about two and one-half years old and out of diapers. The visits were not regularly scheduled; sometimes months passed between visits.

In early 2002, the parties entered into a mediated agreement regarding parenting time. Under the agreement, father was to have parenting time with the children every other weekend. The parties adhered to the agreement until the fall of 2002, when mother obtained a second restraining order against father, who had come at her with a pole and thrown things at her while she was in a car with L. After mother obtained the restraining order, father sent mother a letter stating that he no longer wanted contact with the children.

That changed in 2005, and father again had parenting time with the children every other weekend. Because the second restraining order was still in effect, the children's paternal grandmother would pick up the children.

When L was 11 years old, she stopped visiting father; she testified that she stopped visiting because father called her a name. S and C continued to visit father, but those visits ceased when, after the second restraining order lapsed in October 2006, the grandmother no longer picked up the children. On several occasions, mother drove S and C to father's house for weekend visits, but no one was there to meet them. Father missed three months of visits in a row. S decided she did not want to visit father anymore.

After Christmas 2006, father resumed visits with C every other weekend, and he has continued them since. In addition, C has visited father for longer periods during the summers. In April 2008, father filed a motion for sole custody of C. At the hearing on the motion, father asserted that, under the then current custodial arrangement, his relationship with C was being actively undermined.

At the time of the custody hearing, C was 11. He lived with mother and his sisters, as he had since birth.

Mother was his primary parent and had been since the parties separated 10 years earlier. As father himself testified, C was strongly attached to mother, and mother "support[ed] him 100 percent."

C's sisters were 14 and 12. C and his sisters had what could be described as a typical sibling relationship. C and his oldest sister, L, fought over video games and bickered in the car. L teased C, but she also defended him against teasing by others. C's other sister, S, had always been close to C. S was protective of him; she stopped L from teasing him.

In addition to mother and his sisters, C lived with his stepfather, Sutton. C first met Sutton when C was two and one-half years old and Sutton began dating mother. In 2001, when C was five, mother and the children moved to Bellfountain to live with Sutton. They lived together as a family, and mother and Sutton married in 2006. Sutton and C had a "very good relationship." Sutton helped C with his homework, played catch with him, and supported C's interests in activities such as go-carting and motor biking. According to Sinks, a parenting time coordinator involved in the case, Sutton was "very active" in C's life.

In 2007, C's maternal grandfather, Green, came to live with the family in Bellfountain. He has a stand-alone apartment on the family's property. C spent a lot of time with Green. Green helped C with his homework. C talked with Green, and the two liked to watch television and eat popcorn together. According to mother, "All of [C's] memories have [Green] in them[.] * * * He's a constant figure—male figure in his life."

C attended a small school. He had an individualized educational plan, which included speech therapy and tutoring. He had a good relationship with his tutor and made significant progress each year. He maintained a 3.3 grade point average.

C had two close friends, and C's best friend was "always" at C's house. C had been teased in school because he was big for his age, but both C and his classmates came to appreciate C's size after C joined the football team and, as a lineman, protected his smaller classmates. Both mother and

father attended C's football games. By all reports, C loved being on the football team. He did well and was appreciated as the "big man" on the team.

After football, C joined the wrestling team, which, according to mother, was "devastating." C lost all but one of his matches, and the losses dealt a substantial blow to his self-confidence. As mother explained, C did well in football, where he shared victories and losses with his teammates, but not in wrestling where "you lose solo on a mat." Both father and mother attended C's matches, and C finished the season. But, C was so discouraged that he decided not to play a spring season sport. Mother planned to encourage C to play football again because he enjoyed it so much and because it improved his self-confidence. She did not plan to encourage him to wrestle again.

Father, who had been a successful wrestler, questioned why mother planned to encourage C to play football, but not wrestle. Father believed that mother intentionally restricted C from participating in activities that father was interested in sharing with C. According to father, C stopped participating in Cub Scouts and go-cart racing when father sought to attend those activities. According to mother, C was never registered for Cub Scouts; he went to a few meetings, but did not join the troop because of a scheduling problem and because he did not like a few of the boys in the troop. Mother did not explain why C stopped go-cart racing.

C saw a counselor to help him deal with the tensions between his parents. The counselor served as an independent and supportive listener and advocate for C. According to mother, C "adores" the counselor and greatly benefited from the counseling. C had counseling appointments scheduled during an extended summer visit with father, but father did not take him to the appointments.

C's relationship with father was different from his sisters'. As the trial court found, L and S "are completely soured on their dad." L, the oldest daughter, was approximately six years old when father kicked in the door, and approximately 11 years old when he came at mother with a pole and threw things at her. At the hearing on father's motion for custody of C, the trial court asked L if she still held

the "door breaking down thing" against father, and L said that she did. L added that she did not like father because he had failed to appear for appointments and had attempted to use her to get information about the family, telling her that, if she loved him, she would tell him what happened at her house. L described father "being in and out of our lives for a long time," and she testified that she did not consider him family. She regarded her stepfather, Sutton, as her father. Although L was registered in school under father's last name, which is her legal last name, she opted to use Sutton's name instead. L would like to be adopted by Sutton. At one point, mother pursued the possibility of having Sutton adopt L and S, but ultimately abandoned the idea.

By all accounts, L is a strong-willed and vocal teenager; she does not like father and makes no secret of her feelings. Mother made L go to counseling as part of an effort, required by the trial court, to reestablish contact between L and father. L did not want to go to the counseling, but she did. After a few sessions, the counselor advised that it would not be good for L to see father anymore. Because the counselor's advice was inconsistent with the court's goal of reestablishing contact between L and father, mother contacted Sinks, the parenting time coordinator, for advice on what to do next. Sinks contacted the counselor and confirmed that the counselor had not taken steps towards reestablishing contact between L and father. When the court learned of the counselor's advice, it was shocked and upset with mother. Mother subsequently found a new counselor for L and S.

The trial court granted father's motion for a change in custody and awarded father sole custody of C. The court considered the factors provided in ORS 107.137(1), set out below, for determining whether to modify a custody award. It found two factors "most significant": "(a) [t]he emotional ties between the child and other family members" and "(f) [t]he willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." ORS 107.137(1)(a), (f). Essentially, the court combined the factors described in paragraphs (a) and (f) into one reason—namely, that father's relationship with C is important and it is being undermined at mother's home, as evidenced by mother's failure to have C participate

in extracurricular activities that father would enjoy sharing with him and by L's and S's poor relationship with father.

## ANALYSIS

■■ Determining whether to change a custody award is a two-step process. The first step is to determine whether, since the last judgment or order regarding custody, there has been a change in circumstances relevant to the capacity of one or both parents to care for the child. *Boldt and Boldt*, 344 Or 1, 9, 176 P3d 388, *cert den*, ____ US ____ , 129 S Ct 47 (2008). If there has been such a change, then the second step is to determine whether a change of custody is in the child's best interests. *Id.* The party seeking the change in custody has the burden of proving both that there has been a qualifying change of circumstances and that a change in custody is in the child's best interests. *Id.*

■ In this case, mother's first argument is that father failed to prove a qualifying change in circumstances. That argument is unpreserved. In the trial court, mother's attorney conceded that the court "could find that there's been a change of circumstances because certainly a lot of things happen in 10 years." Mother's attorney also informed the court that he was "going to probably not make an objection that [father] hasn't proven a change in circumstances[.]" Consistent with the attorney's statements, the supplemental judgment—which the court sent to the parties two weeks before entering it—provides that "[m]other (through counsel) stipulated that the Court could find a substantial change in circumstances." Mother did not object to that characterization of her position. Because mother's argument regarding whether there had been a change in circumstances is unpreserved, we do not consider it. ORAP 5.45(1); *State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000) (discussing preservation).

■ Thus, the question becomes whether a change in custody was in C's best interests. Under ORS 107.137(1), when determining the custody of a child, a court "shall give primary consideration to the best interests and welfare of the child," and shall consider the following six factors:

"(a) The emotional ties between the child and other family members;

"(b)   The interest of the parties in and attitude toward the child;

"(c)   The desirability of continuing an existing relationship;

"(d)   The abuse of one parent by the other;

"(e)   The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and

"(f)   The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. However, the court may not consider such willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in a pattern of behavior of abuse against the parent or a child and that a continuing relationship with the other parent will endanger the health or safety of either parent or the child."

First, we consider the emotional ties between the child and other family members. ORS 107.137(1)(a). C has close emotional ties to both parents, as well as his grandfather, his sisters, and his stepfather. C's emotional ties with family members weigh in favor of mother retaining custody. There is a strong preference for keeping C with his mother, his primary parent. *Boldt and Boldt*, 104 Or App 379, 382, 801 P2d 874 (1990) (we may "consider evidence that one parent has been the primary caretaker or is the more nurturing parent"). There is also a strong preference for keeping C with his siblings. *McBrayer v. Randolph*, 191 Or App 553, 560, 83 P3d 936 (2004) (it is in the best interests of the children to remain with their siblings absent " 'overriding reasons' demonstrating that the welfare of a child is better served by separation from a sibling"). If C stays with mother, he will be better able to maintain the relationships that have given him stability and support throughout his life.

Second, we consider the interest of the parties in and attitude toward C. ORS 107.137(1)(b). There is no dispute that both parties exhibit love toward C and have a strong interest in his well-being. Thus, this factor does not weigh in favor of one parent over the other.

Third, we consider the desirability of continuing existing relationships. ORS 107.137(1)(c). As discussed in connection with the first consideration, C has strong emotional ties with his parents, his grandfather, his siblings, and his stepfather, and it is desirable to continue those relationships. It is also desirable to continue the relationships that C has formed at school and with his peers. C has faced challenges in school, but with the help of the special services provided by his tutor, he has done well. He also had a close relationship with his best friend and formed connections with his classmates through football. It will be easier for C to maintain those relationships if he remains with mother.

■ Fourth, we consider abuse of one parent by the other. ORS 107.137(1)(d). ORS 107.137(2) provides, "if a parent has committed abuse, as defined in ORS 107.705, there is a rebuttable presumption that it is not in the best interests and welfare of the child to award sole or joint custody of the child to the parent who committed the abuse." In turn, ORS 107.705 provides, in pertinent part:

"(1) 'Abuse' means the occurrence of one or more of the following acts between family or household members:

"(a) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury.

"(b) Intentionally, knowingly or recklessly placing another in fear of imminent bodily injury."

As described above, mother obtained two restraining orders against father, one in 1999 and one in 2004. Mother obtained the first restraining order after father kicked down her door, and the second after father came at her with a pole and threw things at her while she was in a car with L. The incidents were not addressed in detail during the custody hearing, but we can conclude that, at the least, father "recklessly plac[ed mother] in fear of imminent bodily injury," ORS 107.705(1)(b), and, therefore, that father committed abuse. Because father committed abuse against mother, there is a rebuttable presumption that father should not be awarded custody. ORS 107.137(2). Father did not argue that he had rebutted the presumption, and we need not determine whether he did because, even if he had, the statutory factors would still weigh in mother's favor.

Fifth, as discussed in connection with C's emotional ties, there is a preference for awarding custody to the primary caregiver, mother. ORS 107.137(1)(e).

■      Finally, we consider the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. ORS 107.137(1)(f). At the custody hearing, father asserted that mother had withheld the children from him, had undermined the relationship he has with C by preventing father from participating in C's extracurricular activities, and had promoted an unhealthy relationship between father and the children, evidenced, in part, by the deteriorated relationship between father and L and S. Father also argued that, because C continues to visit father, C is picked on by his sisters and Sutton. We consider the evidence of each of those allegations in turn.

Regarding whether mother withheld the children from father, father did not argue, nor was there any evidence, that mother ever failed to make the children available for parenting time as required by the parties' parenting agreement or by court order. Nor was there any evidence that mother ever failed to communicate with father to facilitate agreed upon or court-ordered parenting time. With respect to C in particular, Sinks informed the court that it "was always relatively easy" to arrange C's parenting time. In addition, mother testified—and father did not dispute—that mother sent father photographs and a video of C simply because she thought father would like to see them.

Regarding C's extracurricular activities, the trial court found that "mother prevented father (who had been a scout leader) from driving to Monroe for Boy Scouts when he offered to do it for [C]." The trial court's finding is based on a credibility assessment, and we accept it. But, mother was not required to make C available to father for extracurricular activities during her parenting time. Mother was free to schedule C's extracurricular activities during her parenting time as she saw fit for C and her family.

Regarding father's relationship with L and S, there is no dispute that, as the trial court found, C's sisters "are completely soured on their dad." Undoubtedly, many factors have contributed to the deterioration of father's relationship

with L and S, including father's actions. The trial court, which had been involved with the family for years, was frustrated with the lack of improvement in father's relationship with the daughters and found fault with mother for failing to take steps to improve it. The trial court found that mother had failed to "foster any relationship" between father and the daughters. We disagree. The record demonstrates that mother had the daughters get counseling in order to improve their relationship with father, and that when one counselor advised that L not have contact with father, mother found another counselor.

In all events, we conclude that the relationship between father and L and S was given more weight than due. This case is about C's best interests, and not about father's relationship with L and S. Taking the record as a whole, whatever role mother played in allowing, or at worst encouraging, daughters to become "soured" on father, we are not persuaded that the same has or will occur with C, who continues to maintain a positive relationship with father.

Finally, father alleged that C's sisters and Sutton teased C about visiting father. But, father did not provide evidence of statements or actions by the sisters or Sutton sufficient to prove his allegation. He offered only one example: that L yelled at C for failing to call home for three days during a visit with father. Although it was not appropriate for L to yell at C, as described by father, L was not critical of C's visit, but of his failure to call home during the visit.

In sum, regarding mother's willingness to support C's relationship with father, we find that there is no evidence that mother has withheld the children from father, and, while it is true that she has not enrolled C in certain extracurricular activities during her parenting time, she was not required to do so. Father's relationship with L and S is unfortunate, but the record does not establish that it is affecting, or will affect, C's relationship with father.

## CONCLUSION

Considering all of the statutory factors together, we are persuaded that it is in C's best interests to remain in mother's custody. The preference for keeping children with

their primary parent weighs in mother's favor, as does the preference for keeping siblings together. Mother and C's sisters, as well as Green and Sutton, have provided C with a stable, supportive family life. In addition, C has found success in his school and social environments and, if possible, should remain in them. Father, who bore the burden of proving that a change in custody was in C's best interests, failed to establish that any interference by mother with his relationship with C was significant enough to justify removing C from his home and community.

In so concluding, we offer two final observations. First, we appreciate that the trial court's determination to the contrary, including its assessment of certain interpersonal dynamics, may well have been informed by its extensive experience with these parties over a period of years. Nevertheless, and most respectfully, our review is properly and necessarily confined to the present record and does not encompass allusions to, or implications from, matters that are not substantiated in this record.

Second, we have no doubt that father loves C, wants the best for him, and is sincerely interested in having custody of him. Nonetheless, on this record, father has not demonstrated that a change in custody is in C's best interests.

Reversed and remanded with instructions to reinstate award of custody to mother and for reconsideration of child support and parenting plan provisions.